[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-10413
Non-Argument Calendar
_____

D.C. Docket No. 1:18-cv-01647-MHC

MY24HOURNEWS.COM, INC.,

Plaintiff - Appellant,

versus

AT&T CORP.,
VERIO, INC.,
NTT AMERICA, INC.,
GENACOM, INC.,

Defendants - Appellees,

ENDURANCE INTERNATIONAL GROUP HOLDINGS, INC.,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(October 16, 2019)

Before MARCUS, ROSENBAUM, and BRANCH, Circuit Judges.

PER CURIAM:

My24HourNews.com, Inc. ("My24"), filed a lawsuit in the Northern District of Georgia arising out of a failed joint venture with AT&T to develop and launch an on-demand and customizable streaming news platform. But it filed that lawsuit too late, according to the district court, which dismissed nearly all of My24's claims as barred by the applicable Georgia statutes of limitations. My24 appeals that ruling, arguing that its claims were timely filed because the limitations periods did not begin to run until 2015, when it discovered that AT&T and its third-party contractors had, according to My24, fraudulently induced My24 to enter into contracts for expensive professional services, which were not actually performed by AT&T, with promises of investment and sponsorship that AT&T allegedly had no intention of performing. My24 also contends that the court abused its discretion by refusing to grant leave to amend the complaint. After careful review, we affirm.

## I.  Factual Allegations

Because this case arises at the motion-to-dismiss stage, we present the facts as alleged in My24's complaint. *See Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1128 (11th Cir. 2019). In 2011, My24, a start-up technology company with "no credit and limited funds," designed a "technical schematic of a backend digital platform" that would allow My24 to stream, on demand and by customer preference,

2

its interactive live video digital news content to internet-connected devices without buffering (the "Broadcast Platform" or "Platform").  My24 identified and vetted several entities, including AT&T, to properly build the Platform, provide a dedicated media and data server, and serve as an investor.

### A.  My24 reaches out to AT&T to build the broadcast platform

After reaching out to AT&T, My24 began what it believed were discussions with AT&T employees regarding investment and development of the Broadcast Platform and potential cross-marketing opportunities, such as preloading a My24 application on every AT&T cell phone.  But My24 actually was dealing with "employees of third-party independent contractors with no authority to bind AT&T regarding professional services or investment."  The third-party contractors included Verio, a global web-hosting provider that has since merged into NTT America, Inc. ("NTTA"), and Genacom, a website development and management company.

On June 21, 2011, Erik Underwood, My24's founder and Chief Executive Officer, confirmed to John Tharp, a Verio employee who introduced himself as part of "AT&T web development services," that My24 had selected AT&T to build the Platform, based in large part on AT&T's potential involvement as an investor/partner.  Underwood conditioned AT&T's selection on My24's retention of all intellectual property associated with the Platform and AT&T's provision of the

3

Platform exclusively to My24.  Tharp did not object to these conditions and advised that AT&T executives were excited about the My24 project.

In September 2011, Underwood began discussions with Todd Olson, a Verio employee who represented himself as an "AT&T executive project manager." During the next several months, Olson and Underwood discussed, among other things, the terms of a non-disclosure agreement, the need for an account manager to be assigned to My24, and the possibility of a joint venture between My24 and AT&T.  Olson also assured Underwood that My24 would retain all intellectual property developed in connection with the Platform and that AT&T would exclusively provide the Platform to My24.

### B.  AT&T begins design and development of the broadcast platform

By early 2012, design and development of the Broadcast Platform had begun without any formal agreement between My24 and AT&T.  Over the next several months, Underwood fielded hundreds of emails pertaining to every aspect of the Platform design from Jennifer Currier of the design and development team. Currier's emails were sent from an account that appeared to be hosted on an AT&T subdomain, but the actual design and development work was being done by Verio and Genacom personnel.  On May 1, 2012, Currier provided Underwood with a comprehensive overview of technical design requirements for the Platform for his approval.  As of that date, My24 and AT&T still had not executed a written

4

agreement regarding the Platform buildout, and, "tellingly," the complaint states, AT&T did not request any payment from My24 for the development of the Platform "even though AT&T was aware that My24 was a start-up company with no credit and limited funds."

Throughout this time, My24 was unaware it was communicating with employees of third-party contractors, instead of AT&T. This was by design. According to the complaint, AT&T authorized and directed Verio and Genacom to tell their employees to hold themselves out as AT&T employees. Emails to Underwood from Verio and Genacom employees were sent from email addresses that appeared to be hosted on AT&T subdomains—e.g., "@att-webhosting.com." And voicemail greetings were recorded so as not to reveal actual corporate affiliations. As a result, My24 alleged, it "did not become aware of the actual corporate affiliations of these individuals until long after My24 had been damaged by Defendants' fraudulent behavior."

### C. My24 and AT&T agree to a joint venture at a partnership meeting

As design and development of the Broadcast Platform progressed, Underwood of My24 and Olson of Verio continued to discuss the possibility of a joint venture. During a conference call in April 2012, Olson informed Underwood that AT&T had assigned Barbara Pepe, an Executive Account Manager for AT&T Services, Inc., to be the official account liaison between AT&T and My24 and to

5

coordinate the joint venture discussions.  Thereafter, Underwood and Pepe communicated daily regarding the Platform and a potential joint venture. Underwood stated that My24 sought a significant investment from AT&T considering the anticipated expenses in launching the Platform and in conducting business operations.  Pepe advised that AT&T was interested in the significant branding opportunities the venture afforded and in obtaining a percentage ownership interest in My24.

The parties agreed to a two-day "partnership/investment meeting" held in Atlanta, Georgia, on May 31 and June 1 of 2012.  Nine individuals participated on behalf of AT&T, and ten individuals participated on behalf of My24.  Other attendees included an account manager from the Associated Press and the president of an advertising firm.

In anticipation of the meeting, My24 and AT&T executed a Mutual Non-Disclosure Agreement ("NDA") on May 11, 2012.  After the parties signed the NDA, Underwood gave Pepe My24's Executive Summary and Market Strategic Analysis.  The information contained in these documents formed the basis of the My24 business plan later provided to AT&T, as discussed below.

On the first day of the meeting, Underwood explained that the proposed joint venture between My24 and AT&T contemplated the following: (a) AT&T Mobility would preload the My24 application on every AT&T smartphone and exclusively

6

deliver My24's live digital video news content to internet-connected devices; (b) AT&T would provide product sponsorship and placement, would cross-market AT&T, and would co-brand its name with My24; and (c) AT&T would invest $25 million for My24's launch, $2.2 million for headquarters' expenses, and $75 million for brand development for My24's other digital media brands, for a total investment of $102.2 million. For its part, AT&T explained how it could achieve the proposed partnership/investment goals and that it would be the exclusive provider of My24, would receive 20% of My24, and would co-brand AT&T with My24.

The next day, immediately before the meeting started, Pepe and Blair Bardwell, who had taken a leading role in the meeting on AT&T's behalf, met privately with Underwood outside the conference room. Bardwell told Underwood that AT&T accepted My24's joint venture proposal regarding the launch of My24— what My24 calls the "Launch JV"—on the condition that My24 agree to launch My24 at a presidential town hall meeting or debate during the 2012 United States presidential election campaign. Bardwell further proposed that AT&T would provide My24 an additional $75 million for My24's multimedia expansion—what My24 calls the "Multimedia Expansion JV"—if My24 would in turn (a) grant AT&T a 20% interest; (b) agree to exclusive cross-marketing and co-branding rights; and (c) agree to launch My24 during a Presidential Town Hall meeting. Underwood agreed to these terms.

7

After this private meeting, Underwood, Pepe, and Bardwell entered the conference room and announced the formation of these joint-venture agreements and the "specific dollar amounts" to the meeting participants. But Bardwell did not mean what he said. Just before meeting with Underwood, and without his knowledge, Bardwell and Pepe had informed Olson "that there was no way AT&T would provide the funding requested by My24."

## D. My24 and AT&T plan to launch the broadcast platform at a presidential town hall and sign the network agreements

Following the partnership meeting, My24 and AT&T began to plan the presidential town hall. Given that My24 was a start-up technology company "virtually unknown in media and political circles," AT&T provided My24 a "Sponsorship Letter" that it could use to communicate with the presidential candidates' campaigns. Bardwell also asked Underwood to prepare a business plan in the Harvard Business School format so that Bardwell could "build a story in a format that [his] peers [were] familiar with." On June 18, 2012, Underwood sent the requested business plan, which, among other things, set forth AT&T's total investment in My24 and AT&T's corresponding equity interest in My24.

Soon after, the parties held a conference call to discuss various matters related to My24's launch and the presidential town hall, including the resources My24 needed to launch. During this call, Bardwell referenced and affirmed the terms of the Launch JV, which "entailed funding the Broadcast Platform build out, funding

8

My24's launch, and sponsoring the Presidential Town Hall Meeting." Bardwell advised Underwood that funding was assured but it had to be processed through the required AT&T channels. By June 2012, AT&T had finalized the development of the Platform.

Ohio State University emerged as a potential venue for the town hall. On August 10, 2012, AT&T and My24 held a conference call with an Ohio State representative. During this call, Pepe assured Ohio State that AT&T would be sponsoring the town hall and funding all expenses. Underwood then traveled to Ohio State to tour the venue and obtain dates for a town hall in October 2012.

Shortly after Underwood returned from Ohio, AT&T requested that Underwood sign several agreements. These included a Wholesale Master Service Agreement, a Network Integration Services and Equipment Resale Pricing Schedule, a Content Delivery Network Pricing Schedule, and a Synaptic Hosting Service Pricing Schedule (collectively the "Network Agreements"). My24 executed the agreements on August 23, 2012, with Ms. Pepe's assurances that AT&T would perform its obligations under the joint venture agreements.

Preparations for the presidential town hall continued into October 2012. Pepe advised Underwood that AT&T was committed to funding the event but that she needed some time to obtain the funds. On October 10 and 11, 2012, My24 and AT&T held another two-day meeting in Atlanta to solidify arrangements for the

9

town hall, including AT&T's branding ideas, and to further assess My24's technical and financial requirements for the launch. Pepe again assured Underwood that AT&T would fund the town hall and provide everything necessary to launch My24.

When My24's Atlanta studio experienced foundation problems and water damage in October 2012, Pepe advised Underwood that AT&T could provide a temporary studio for the launch via an AT&T satellite truck. Additionally, in connection with My24's search for a permanent studio, Pepe affirmed to a property-management company that AT&T and My24 were partners and that AT&T was financially supporting My24's launch. Pepe's representations helped secure the lease and building concessions. While My24's studio was being built, Pepe helped My24 find temporary studio space in Denver, where My24 relocated permanently.

As the 2012 presidential election drew near with plans still incomplete, the parties realized that it would be too late to launch My24 before the election. As a result, Pepe changed course and urged Underwood to launch My24 during a presidential interview. Pepe assured Underwood that AT&T would sponsor the event and fund the launch as it had originally agreed in the Launch JV.

### E. AT&T abandons the joint ventures

At this point, the otherwise exhaustive complaint runs out of details. It alleges in conclusory fashion that AT&T "never sponsored the Presidential Town Hall Meeting or the Presidential Interview" and "never funded the Launch JV or the

Multimedia Expansion JV." But it offers no other details regarding AT&T's conduct after late 2012, apart from these unexplained assertions: "Upon information and belief," AT&T "disclosed and/or utilized trade secrets relating to My24's Business Plan and intellectual property associated with the Broadcast Platform" in conjunction with its acquisition of DirecTV on July 24, 2015, and its proposed acquisition of Time Warner announced on October 22, 2016.

## II.  Procedural History

### A.  Prior Litigation Between the Parties

This is the third round of litigation between My24 and AT&T. My24 first filed suit against AT&T in the United States District Court for the District of Colorado on June 9, 2015.[1] *My24HourNews.Com, Inc. v. AT&T Corp.*, No. 1:15-cv-012120-RM-NYW (D. Colo. 2015). Based on substantially the same allegations as in the current complaint, My24 alleged claims of breach of contract, breach of fiduciary duty, promissory estoppel, fraudulent inducement, theft of trade secrets, unjust enrichment, conversion, and negligent misrepresentation. Notably, My24 alleged that AT&T breached the joint-venture agreements on December 7, 2012, when AT&T billed My24 for developing the Platform, the costs of which AT&T was to bear under the joint-venture agreements. *See id.*, Doc. 1 ¶110 ("[P]ursuant to

---

[1] We may take judicial notice of another court's records to establish the fact of such litigation and related filings. *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

the agreed upon Joint Venture, *viz.*, the JV-My24 Launch, AT&T had promised My24 that it would pay for the development of the Broadcast Platform, as well as all other expenses associated with the launch of My24.").

After jurisdictional discovery, the Colorado action was dismissed without prejudice for lack of personal jurisdiction on July 21, 2016.  On March 2, 2017, the court then denied My24's motion to transfer the case to the Northern District of Georgia, despite My24's representations that its claims would be time-barred if the court did not transfer the case on or before December 6, 2016, in large part because My24 failed to take any action to protect itself following the July 2016 dismissal.

Nearly six months later, on August 29, 2017, My24 initiated a new action against AT&T in the United States District Court for the Southern District of New York. *My24HourNews.Com, Inc. v. AT&T Corp.*, No. 1:17-cv-06657-RA (S.D.N.Y. 2017).  It never served the initial complaint, however, instead filing an amended complaint on January 18, 2018, adding as defendants Verio, NTTA, and Genacom. My24 served the defendants but then voluntarily dismissed the amended complaint in early February 2018 before the defendants filed an answer or responsive pleading.

## B. My24's Current Action

My24 then filed the current action in the United States District Court for the Northern District of Georgia on April 18, 2018.  The complaint contains a multitude of counts.  Counts I (all defendants), II (AT&T), and VI (AT&T) alleged claims of

fraudulent inducement to enter into the Network Agreements, the Launch JV, and the Multimedia Expansion JV, respectively. Counts III through V (AT&T) alleged claims of breach of contract, breach of fiduciary duty, and promissory estoppel related to the Launch JV, while Counts VII through IX (AT&T) alleged nearly identical claims related to the Multimedia Expansion JV. Additionally, the complaint alleged violations of the Georgia RICO statute, O.C.G.A. § 16-14-4 (Counts X and XI (all defendants)); violation of Georgia Unfair and Deceptive Trade Practices Act, O.C.G.A. § 10-1-372 (Count XII (all defendants)); breach of the NDA (Count XIII (AT&T)); violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b) (Count XIV (AT&T)); misappropriation of trade secrets (Count XV (AT&T)); unjust enrichment (Count XVI (AT&T)); conversion (Count XVII (AT&T)); fraud (Count XVIII (all defendants)); negligent misrepresentation (Count XIX (all defendants)). Finally, the complaint sought permanent injunctive relief (Count XX), attorney's fees and prejudgment interest (Count XXI), and punitive damages (Count XXII).

In general, the fraud-based claims alleged that AT&T made two categories of misrepresentations: (1) that design and development work on the Platform was being performed by AT&T, when in fact these services were performed by third-party contractors Verio and Genacom; and (2) that AT&T agreed to invest approximately $27 million for My24's launch and an additional $75 million for its multimedia

13

expansion.  AT&T made these false representations, according to the complaint, "for the purpose of inducing My24 to contract for expensive professional services for the build out of the Broadcast Platform."

The defendants moved to dismiss the action largely on the ground that My24's claims were time barred.  The district court agreed, dismissing nearly all claims—Counts I–XII and XV–XIX—as barred by the applicable Georgia statutes of limitations.  The court dismissed the remaining claims as follows:  Count XIII was untimely under the Master Service Agreement and, alternatively, My24 did not establish personal jurisdiction over AT&T for that claim; Count XIV failed because the allegedly violative conduct predated the enactment of the Defend Trade Secrets Act in 2016; and Counts XX–XXII were requests for remedies that could not stand without another viable claim.  My24 now appeals.

## C.  Claims Remaining on Appeal

Before we address My24's arguments on appeal, we pause to clarify what claims are still at issue.  My24 expressly abandons Counts III, VII, XVI, and XVII (breach of the Launch and Multimedia Expansion JVs, unjust enrichment, and conversion).  My24 also abandons other counts by failing to challenge all grounds for their dismissal in its initial brief, including Count XIII (breach of NDA), which the court dismissed in the alternative as untimely under the Master Service Agreement, and Count XIV (violation of the Defend Trade Secrets Act), which the

14

court dismissed because it was based on conduct that predated enactment of the relevant statute. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) ("When an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed."). We affirm the dismissal of these claims without further discussion.[2]

With regard to the remaining claims—Counts I, II, IV–VI, VIII–XII, XV, and XVIII–XXII—My24 invokes a Georgia statute that permits tolling of a statute of limitations "when the defendant intentionally conceals information that he ought to reveal, thereby causing the plaintiff to be deterred from filing suit." *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 507 S.E.2d 411, 416 (Ga. 1998) (discussing O.C.G.A. § 9-3-96). My24 maintains that the limitations periods did not begin to run until late 2015, when it first learned from jurisdictional discovery in the Colorado action that AT&T never intended to deliver its end of the bargain and "had been intentionally working all along with other entities posing as AT&T to lure My24 into a deal that would only benefit the defendants."

---

[2] My24 appears to address one of these claims for the first time in its reply brief, but that comes too late. *United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court.").

15

### III.  Standard of Review

We review *de novo* an order granting a motion to dismiss on statute-of-limitations grounds, accepting the allegations in the complaint as true and construing all reasonable inferences in the plaintiff's favor.  *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).  "A statute of limitations bar is an affirmative defense, and plaintiffs are not required to negate an affirmative defense in their complaint."  *Id.* (quotation marks, ellipsis, and alterations omitted).  As a result, "[a] dismissal for failure to state a claim on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred."  *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1085 (11th Cir. 2018).

### IV.  Discussion

A federal court sitting in diversity must apply the substantive law, including statutes of limitations, of the relevant state—here, Georgia.  *Miss. Valley Title Ins. v. Thompson*, 802 F.3d 1248, 1251 n.2 (11th Cir. 2015).  My24's claims all have a limitations period of five years or less: four years for the oral contract and tort claims,[3] O.C.G.A. §§ 9-3-26, 9-3-31; five years for the misappropriation-of-trade-secrets claim, *id.* § 10-1-766; and five years for the RICO claims, *id.* § 16-14-8.

---

[3] For claims of breach of fiduciary duty, the limitations period is borrowed based on the "conduct giving rise to the claim," *Godwin v. Mizpah Farms, LLLP*, 766 S.E.2d 497, 504 & n.8

16

Ordinarily, a statute of limitations begins to run on the date a cause of action accrues. *Jankowski v. Taylor, Bishop & Lee*, 273 S.E.2d 16, 18 (Ga. 1980). For torts, the general rule is that "both the wrongful act and the damage must exist in order for there to be a cause of action." *Id.* Yet "the suffering of damages to the fullest extent" is generally not required. *Id.* Instead, "the limitation period commences to run from the first appreciable injury regardless of whether the plaintiff has yet to experience all of the damage which may ultimately arise." *Stafford-Fox v. Jenkins*, 639 S.E.2d 610, 616 (Ga. Ct. App. 2006). For instance, the limitations period for fraud claims generally begins to run when the plaintiff first sustains actual damages from the fraud. *Green v. White*, 494 S.E.2d 681, 685 (Ga. Ct. App. 1997).

In cases of fraud by the defendant that "debar[s] or deter[s]" a plaintiff from bringing an action, however, "the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." O.C.G.A. § 9-3-96. To establish tolling under § 9-3-96, a plaintiff must prove three things: (1) a defendant committed actual fraud; (2) the fraud concealed the cause of action from the plaintiff; and (3) the plaintiff exercised reasonable diligence to discover the cause of action. *Daniel v. Amicalola Elec. Membership Corp.*, 711 S.E.2d 709, 716 (Ga. 2011). Where, as here, the gravamen of the complaint is actual fraud, "the limitation period is tolled

---

(Ga. Ct. App. 2014), which here is fraud and breach of oral contracts. Accordingly, a four-year limitations period applies to the claims of breach of fiduciary duty.

17

until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." *Rollins v. LOR, Inc.*, 815 S.E.2d 169, 178–79 (Ga. Ct. App. 2018) (quotation marks omitted).

The existence of a "confidential relationship" between the parties affects the showings required for the second and third elements. *Id.* at 179. Specifically, "[w]here a confidential relationship exists, a plaintiff does not have to exercise the degree of care to discover fraud that would otherwise be required, and a defendant is under a heightened duty to reveal fraud where it is known to exist." *Frame*, 507 S.E.2d at 414. But the plaintiff still must establish "the fraud itself—the defendant's intention to conceal or deceive"—and that it was deterred in suing by the fraud. *Id.* A confidential relationship may arise from a joint venture or partnership. *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1249 (11th Cir. 2007).

### A.  My24's complaint is deemed filed as of January 18, 2018

We start by clarifying the date My24 filed its claims. Although My24 filed the current action on April 18, 2018, it contends that, under Georgia law, it can use the date it filed either the initial or amended complaint in the New York action.

"The Georgia renewal statute provides that the statute of limitations is satisfied if a plaintiff files a valid action within the limitations period, that action is later dismissed, and the plaintiff files a new action (that would otherwise be time-

18

barred) within six months of the dismissal." *Scott v. Muscogee Cty., Ga.*, 949 F.2d 1122, 1123 (11th Cir. 1992) (citing O.C.G.A. § 9-2-61). Service of the complaint is "essential" for renewal under § 9-2-61. *Id.*; *see George v. S. Ry. Co.*, 218 S.E.2d 447, 448 (Ga. Ct. App. 1975) (time-barred amended complaint could not relate back because original complaint was never served).

Here, My24 may be entitled to renewal under § 9-2-61 because it filed the current action within six months of the dismissal of the New York action. But since only the amended complaint was served on the defendants in that action, the earliest My24's claims could be deemed filed is January 18, 2018, when My24 filed the amended complaint in that case. *See George*, 218 S.E.2d at 448. As a result, My24's claims are time-barred if My24 knew or should have known of the existence of its claims prior to January 18, 2013, or January 18, 2014, depending on whether a four- or five-year limitations period applies. *See Rollins*, 815 S.E.2d at 178–79.

### B. My24's claims are time-barred

Because this appeal arises from the grant of a motion to dismiss, the question is whether it is apparent from the face of the complaint that My24's claims are time-barred in light of My24's contention that it did not discover the alleged fraud until 2015. *See Hunt*, 887 F.3d at 1085. In answering that question, we also consider the Network Agreements that were attached to the motion to dismiss, which the district court found—and My24 does not dispute—were central to the complaint and of

undisputed authenticity.  *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("[T]he court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed.").

As we noted above, My24 alleges two relatively distinct categories of misrepresentations by the defendants: (1) that design and development work on the Platform was being performed by AT&T, when in fact these services were performed by third-party contractors Verio and Genacom; and (2) that AT&T agreed to invest approximately $27 million for My24's launch and an additional $75 million for its multimedia expansion.  Both categories of misrepresentations were made, according to My24, "for the purpose of inducing My24 to contract for expensive professional services for the build out of the Broadcast Platform."  We address each category separately.

1.    Claims Based on AT&T's Use of Third-Party Contractors

In asserting that its claims are timely, My24 maintains that it did not discover the defendants' fraud until late 2015 during jurisdictional discovery in the Colorado action.  At that time, according to My24, it obtained two key pieces of information about AT&T's use of third-party contractors: (1) a contract between AT&T and Verio that required Verio personnel to present themselves as AT&T employees in customer interactions; and (2) emails showing that, consistent with that contract,

20

Verio and Genacom employees altered their normal Verio.com and Genacom.com email addresses when interacting with My24. More generally, My24 contends that the district court erred by ignoring the confidential relationship between the parties and misinterpreting the Network Agreements.

Here, the limitations periods began to run on My24's claims based on AT&T's use of third-party contractors no later than August 2012. On August 23, 2012, My24 signed Network Agreements with AT&T that disclosed the contractor-subcontractor relationship between AT&T and Verio and the possibility of other third-party subcontractors, such as Genacom. Specifically, the Content Delivery Network Pricing Schedule disclosed that certain services and features may be "provided by third parties under agreements with AT&T." Doc. 36-7 at 35. The Network Integration Services and Equipment Resale Pricing Schedule is more explicit, designating "Verio Inc." as the "third party provider of the services under this [statement of work]" pursuant to "the agreement between AT&T and Verio Inc." These agreements put My24 on notice that Verio and other third-party contractors may have performed or could perform services on AT&T's behalf in relation to the Platform.

Although My24 learned of new information during jurisdictional discovery in the Colorado action, a party is not excused from bringing suit until it has all facts relevant to its claims. *See Allmond v. Young*, 723 S.E.2d 691, 693 (Ga. Ct. App.

21

2012) (holding that the plaintiffs were on notice of the basis for their claims even though they later learned of subsequent events that also supported their claims). And we cannot say that any of these additional facts were necessary to put My24 on notice of its claims. As of December 2012, My24 may not have known the terms of the actual contract between AT&T and Verio or that Verio and Genacom employees had concealed their true corporate affiliation, but it knew that AT&T had contracted with Verio in relation to work on the Platform and of the possibility of other third-party contractors as of August 2012.

My24 contends "that snippets of the 40-page, single-spaced Network Agreements" should not be deemed to provide notice as a matter of law, particularly in light of the confidential relationship between the parties arising from the joint-venture agreements. But while "the level of diligence required by the plaintiff in investigating the fraud is lessened where a confidential relationship exists, it is not entirely extinguished." *Cochran Mill Assocs. v. Stephens*, 648 S.E.2d 764, 769 (Ga. Ct. App. 2007). And My24 identifies no case in which Georgia courts have held that a confidential relationship relieved a party of its ordinary responsibility to read a written contract and be aware of its terms. *Cf. Novare Grp., Inc. v. Sarif*, 718 S.E.2d 304, 308 (Ga. 2011) ("[T]he only type of fraud that can relieve a party of his obligation to read a written contract and be bound by its terms is a fraud that prevents the party from reading the contract.").

22

So even assuming the existence of a confidential relationship, My24 is not wholly excused from exercising some level of diligence in its dealings with AT&T, such as reading legal contracts. Since the Network Agreements disclosed that third-party contractors may have performed or could perform services on AT&T's behalf in relation to the Platform, the district court correctly concluded that the agreements "would have raised a concern to any reasonable person as to whether AT&T would be providing them services." Accordingly, My24 knew or should have known as of August 2012 of any fraud-based claims based on the defendants' alleged luring of My24 into the belief that only AT&T would provide services to My24.

2.    Claims Based on AT&T's False Promises to Fund My24

As to the claims based on AT&T's false promises to fund My24's launch and expansion, My24 again claims that it did not discover the defendants' fraud until late 2015 during jurisdictional discovery in the Colorado action. It was not until September 7, 2015, according to My24, that it obtained the "smoking-gun evidence"—from a declaration by Olson of Verio—that AT&T, shortly before publicly announcing the joint-venture agreements at the partnership meeting, had declared that "there was no way AT&T would provide the funding requested by My24." More generally, My24 contends that the district court erred by ignoring the confidential relationship between the parties and misinterpreting the Network Agreements.

23

Here, the district court did not err in dismissing these claims as time-barred. My24's contention that it did not discover the fraud until September 2015 is contradicted by its original complaint in the Colorado action. That complaint, filed in June 2015, raised claims of fraudulent inducement, which, like the current complaint, alleged that AT&T misrepresented that it would invest in My24, even though it had "had no intention of going through" with the joint-venture agreements, for the purpose of inducing My24 to contract with AT&T for professional services and then misappropriating the Platform. In other words, My24 pled essentially identical claims of fraud in the Colorado case even before it received Olson's declaration during jurisdictional discovery in September 2015. So it cannot be the case that this "smoking-gun evidence" was critical to My24's knowledge of the fraud, such that it would excuse My24 from bringing suit earlier. *See Allmond*, 723 S.E.2d at 693.

Based on the complaint and the Network Agreements, we conclude that the applicable limitations periods for these claims began to run no later than December 2012, as My24 itself represented to the court in the Colorado action. My24 concedes that in December 2012 AT&T billed My24 for its work—or the work of Verio and Genacom on behalf of AT&T—developing the Platform. That action is significant because it contradicted My24's understanding of its relationship with AT&T. My24 was a "start-up company with no credit and limited funds," and it had engaged with

24

AT&T in the hope of obtaining "an investment partner to fund the development of the platform and its business operations." Doc. 1 ¶ 20. My24 believed it found that partner in AT&T, which knew of My24's financial situation and agreed in June 2012 to the "Launch JV, which entailed funding the Broadcast Platform build out," as well as other expenses associated with the launch. But instead of providing the funding, AT&T provided a bill. So by December 2012, My24 had notice that AT&T did not intend to fulfill at least part of the Launch JV, despite its promises to the contrary.

Downplaying the significance of the bill, My24 argues that "the bill, on its own, did nothing to indicate whether or when AT&T would provide the money to pay the bill by, for example, funding the parties' joint venture."

But the complaint gives no hint that the parties contemplated such an arrangement. In the complaint, My24 alleged that during development of the Platform, which was largely complete by the end of June 2012, the parties had not executed any written agreement regarding the Platform and AT&T had not billed My24 for any work. The complaint describes it as "telling[]" that AT&T had not requested any form of payment as of early May 2012 "even though AT&T was aware that My24 was a start-up company with no credit and limited funds." The parties then entered the Launch JV, "which entailed funding the Broadcast Platform build out." And pursuant to that contract, AT&T repeatedly promised My24 and others, even after the Network Agreements were executed, that it would cover the various

25

costs associated with the launch of the Platform, such as expenses for the Presidential Town Hall, not that it would bill My24 for these expenses while also providing funding for My24 to pay the bills.  While My24 now attempts to introduce some uncertainty as to when or how AT&T would provide the promised funding, we think it's clear from the complaint's allegations that My24 did not expect to be billed for development of the Platform, putting My24 on notice that AT&T was acting contrary to the joint venture agreements.

Nor was the December 2012 bill My24's only notice that AT&T was misrepresenting its commitment to the joint ventures.  In last August 2012, after AT&T had agreed to the joint ventures at the partnership meeting, My24 executed the Network Agreements with AT&T.  Included in the Network Agreements was the Master Service Agreement, which, contrary to AT&T's representations to My24 and Underwood, expressly disclaimed the formation of any partnership or joint venture and indicated that AT&T's work on the Platform did not guarantee or imply any partnership or sponsorship by AT&T to My24.

My24 maintains that the Network Agreements do not preclude tolling as a matter of law because they were narrow and covered different services than the joint-venture agreements.  According to My24, the Network Agreements "covered only certain limited, back-end technical services associated with producing the platform itself—not the full panoply of services, investment, and joint efforts covering the

Launch JV or Multimedia JV." Because the Network Agreements covered distinct services, in My24's view, they "do not cover and, thus, have no relevance to," the services to be performed under the joint-venture agreements.

However, My24's claim that the Network Agreements are distinct from the joint-venture agreements is belied by its own allegations. My24's complaint makes clear that the buildout of the Platform was essential to both My24's launch and any subsequent multimedia expansion. AT&T knew that My24 was a technology start-up company dependent on AT&T's financial backing to launch its operations. And, according to complaint, the Launch JV "entailed funding the Broadcast Platform build out," upon which the launch and expansion rested. There was, in short, overlap between the terms of the joint-venture agreements and the services contemplated by the Network Agreements. Nor did the district court erroneously treat the Network Agreements as the whole of My24's agreement with AT&T and ignore the separate joint-venture agreements. As the court explained, the Network Agreements are significant not because they would necessarily bar My24 from proving the joint-venture agreements as a matter of law, but instead because they contain terms contrary to My24's understanding of its relationship with AT&T and the funding of the Platform buildout.

My24 points out that AT&T continued to affirm the joint-venture agreements after My24 executed the Network Agreements and, in so doing, further concealed

27

its fraudulent intentions.  But even though AT&T may have quelled My24's doubts about the Network Agreements by reaffirming the joint ventures, My24 could not reasonably rely on AT&T's misrepresentations once AT&T contradicted the terms of the Launch JV by billing My24 for development of the Platform in December 2012.  And My24 does not allege any additional acts of concealment or post-billing assurances regarding the joint ventures after 2012.

My24 falls back on the argument that it had a lessened duty to discover the fraud, and AT&T had a heightened duty to reveal the fraud, due to a confidential relationship arising from the oral joint-venture agreements.  That may be true as far as it goes, but My24 still must show it was debarred or deterred by the defendants' alleged fraud.  *See Frame*, 507 S.E.2d at 414.  And as we have noted, even assuming the existence of a confidential relationship, My24 was not wholly excused from exercising some level of diligence in its dealings with AT&T.  *Cochran Mill Assocs.*, 648 S.E.2d at 769.  As we have explained, My24 had received information by December 2012 that contradicted My24's understanding of its arrangement with AT&T.  So, with even minimal diligence, My24 should have discovered the alleged fraud.

In sum, the Network Agreements and the December 2012 bill contradicted My24's beliefs that AT&T would fund the development of the Platform and that the development of the Platform was part of a broader joint-venture agreement.  Because

28

the complaint alleges that AT&T misrepresented its commitment to the joint ventures for the purpose of billing My24 for these services, it follows that My24 first suffered damage from AT&T's alleged fraud no later than December 2012, when it received its first bill for professional services that My24 thought were included in the Launch JV. *See Stafford-Fox*, 639 S.E.2d at 616. Thus, My24 had adequate notice of its claims at the time they accrued in December 2012.

    3.    <u>Dismissal was appropriate at the motion-to-dismiss stage</u>

Finally, My24 argues that the statute-of-limitations issues are fact-specific and inappropriate for resolution at the motion-to-dismiss stage. It notes that it was not required to establish tolling in its complaint and that the Georgia Court of Appeals has described a motion to dismiss as an "anomalistic vehicle" to resolve a statute-of-limitations-based defense. *See Goldston v. Bank of Am. Corp.*, 577 S.E.2d 864, 866 (Ga. Ct. App. 2003) ("A motion to dismiss is an anomalistic vehicle by which to assert an action as time-barred by a statute of limitation.").

Yet it remains the case that "[a] Rule 12(b)(6) motion to dismiss for failure to state a claim is an appropriate method for raising a statute of limitations defense." *Mann v. Adams Realty Co., Inc.*, 556 F.2d 288, 293 (5th Cir. 1977)[4]; *see also Allmond*, 723 S.E.2d at 694 (affirming the grant of a motion to dismiss on statute-

---

[4] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

of-limitations grounds despite the plaintiffs' invocation of the tolling-by-fraud provision). To be sure, "[a] dismissal for failure to state a claim on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *Hunt*, 887 F.3d at 1085. But "[a] plaintiff nonetheless can plead himself out of court" through the factual allegations in the complaint. *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971 (11th Cir. 2016) (*en banc*). Likewise, other materials properly considered at the motion-to-dismiss stage may prevent a plaintiff from establishing tolling. *See Day*, 400 F.3d at 1276.

Here, we conclude that it is apparent from the face of the complaint and the Network Agreements, which My24 does not dispute were properly considered at the motion-to-dismiss stage, that the defendants' fraud did not debar or deter My24 from discovering its fraud-based claims after December 2012 and that My24 knew or should have known of the existence of its claims as of that month.

## C. The district court properly denied leave to amend

Finally, My24 argues that the district court abused its discretion by not allowing My24 even one opportunity to amend its complaint before dismissal.

We review a district court's decision to grant or deny leave to amend for an abuse of discretion. *Long v. Satz*, 181 F.3d 1275, 1278 (11th Cir. 1999). "Filing a motion is the proper method to request leave to amend a complaint." *Id.* at 1279 (citing Fed. R. Civ. P. 7(b)(1)). The motion "should either set forth the substance of

30

the proposed amendment or attach a copy of the proposed amendment." *Id.* A court does not abuse its discretion in denying leave to amend where the plaintiff fails to properly request leave to amend. *Id.*

Here, rather than file a motion for leave to amend, My24 included its request in the memorandum filed in opposition to AT&T's motion to dismiss. Even assuming that request was the functional equivalent of a motion, My24 failed to attach the proposed amendment or set forth the substance of the proposed amendment, as required by *Long*. *See id.* (rejecting a request for leave to amend for identical reasons). My24 simply requested "leave to amend to cure any defects." That is not enough, and the district court acted within its discretion by denying the embedded request for amendment.

## V.

For the reasons stated, we affirm the district court's judgment dismissing My24's complaint as barred by the applicable Georgia statutes of limitations. We also affirm the denial of leave to amend.

**AFFIRMED.**

31